UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| KIMBERLY C. FABRIO, | ) |  |
|---|---|---|
|  | ) |  |
| Plaintiff, | ) |  |
|  | ) | Case No. 4:18-CV-1469 PLC |
| vs. | ) |  |
|  | ) |  |
| ANDREW M. SAUL,[1] | ) |  |
| Commissioner of Social Security | ) |  |
|  | ) |  |
| Defendant. | ) |  |

## MEMORANDUM AND ORDER

Plaintiff Kimberly Fabrio seeks review of the decision by Defendant Social Security Commissioner Andrew Saul denying her application for a period of disability and Disability Insurance Benefits under the Social Security Act. Because the Court finds that substantial evidence supports the decision to deny benefits, the Court affirms the denial of Plaintiff's application.

**I.     Background and Procedural History**

In November 2015, Plaintiff, who was born on August 3, 1965, filed an application for a period of disability and Disability Insurance Benefits, alleging that she became disabled on February 1, 2010 due to "osteomyelitis of left ankle; torn meniscus on right knee; multiple levels of degenerative disc disease; disc extrusions in lumbar spine; depression; and anxiety." (Tr. 65-72) The Social Security Administration (SSA) denied Plaintiff's claims, and she filed a timely request for a hearing before an administrative law judge (ALJ). (Tr. 74-78, 81-83)

---

[1] At the time this case was filed Nancy A. Berryhill was the Deputy Commissioner of Social Security.

In November 2017, the ALJ conducted a hearing at which Plaintiff and a vocational expert testified. (Tr. 29-63) In a decision dated February 23, 2018, the ALJ found that Plaintiff "was not under a disability, as defined in the Social Security Act, at any time from February 1, 2010, the alleged onset date, through March 31, 2015, the date last insured[.]" (Tr. 15-24) Plaintiff filed a request for review of the ALJ's decision with the SSA Appeals Council, which denied review. (Tr. 1-8) Plaintiff has exhausted all administrative remedies, and the ALJ's decision stands as the SSA's final decision. Sims v. Apfel, 530 U.S. 103, 106-07 (2000).

**II.     Evidence Before the ALJ**

A.  Hearing

Plaintiff testified that she was fifty-two years old and had a GED and "some college," as well as a certificate in "medical assisting." (Tr. 32-33) Plaintiff lived with her "adopted granddaughters," who were eight and thirteen years old. (Tr. 33)

In 2014, Plaintiff worked as a CNA for Attending Angels until she injured her back lifting a patient. (Tr. 45, 49) Prior to that, Plaintiff worked various temporary services jobs for short periods of time because "that's how my jobs go because I just can't do it." (Tr. 45-46) Plaintiff explained that her pain and resulting attendance problems caused her to leave jobs at several factories, a nursery, and the Department of Corrections. (Tr. 46-48)

Plaintiff stated that she was first diagnosed with osteomyelitis when she was five years old "and ever since then I've been struggling with pain[.]" (Tr. 34) The osteomyelitis affected her left ankle but "it kind of messed up through the years all my other parts of my body with my work I did." (Tr. 34)

In addition to her left ankle, Plaintiff experienced pain in her knees, hips, and back. (Id.) Plaintiff's back hurt "all the time[.]" (Tr. 49) In regard to her right knee, Plaintiff testified that,

2

in 2013, an orthopedic surgeon recommended surgery for a torn meniscus, but another doctor, who provided a second opinion, informed her that surgery "wasn't really going to help me that much." (Tr. 50) An orthopedic surgeon recently recommended Plaintiff undergo right knee injections, but she declined because she was "[s]cared." (Tr. 37)

In regard to her mental impairments, Plaintiff testified that she had "anxiety, depression issues…[a] long time." (Tr. 52) Plaintiff explained "I get worked up about things" and "I cry a lot." (Tr. 53) Plaintiff also had difficulty concentrating, staying on task, and following instructions. (Tr. 54-55)

Plaintiff's primary care physician, Dr. Rose, treated her pain and her mental health symptoms. (Tr. 34-35) Plaintiff testified that she had been taking fluoxetine since 2010 and Norco since 2014. (Tr. 34-35) She also took Ambien, Lisinopril, hydrochlorothiazide, and metformin. (Tr. 35, 38) Plaintiff stated that her pain medication made her feel "tired, a little, you know, light-headed, loopy" and caused "stomach problems," and fluoxetine made her "a little drowsy." (Tr. 36) Plaintiff expressed concern that her pain medications were losing their effectiveness. (Id.)

Plaintiff appeared at the hearing with a crutch and stated that she had been using it "[o]ff and on since I was five years old. I have a wheelchair also, and it gets to the point where I have to use that at home." (Tr. 38-39) In addition, Plaintiff had "like an office chair with wheels so I can roll and do my dishes, or do some cooking." (Tr. 39) Plaintiff had been wearing a brace on her right knee for four years" and had "several ace bandages I wear on my ankle when it gets to the point to where I have to crawl, or something, where I can't walk for support, I guess." (Tr. 39)

Plaintiff was unable to tie her shoes and used a bench when she showered. (Tr. 40) Plaintiff testified that she was able to stand "maybe 15 minutes before I have to sit down" and "it's hard to get back up and be on my feet." (Id.) Plaintiff could sit "[a]t the most 20 minutes" and she was "in pain all the time…but then it gets where I can't sit anymore, I have to go lay down on my bed." (Tr. 41) Plaintiff was able to do laundry and her granddaughters helped fold clothes. (Id.) Plaintiff could go to the grocery store "some of the time, and when I do, I grab a cart, and I use it as a walker…." (Id.) The heaviest item Plaintiff could lift was "at least a gallon" of liquid detergent. (Tr. 42) Plaintiff enjoyed cooking, but she spent most of her time in her nightgown watching television. (Tr. 41, 43)

A vocational expert also testified at the hearing. (Tr. 56-62) The ALJ asked the vocational expert to consider a hypothetical individual with Plaintiff's age, education, and work experience as Plaintiff that could:

> [l]ift 20 pounds on occasion, and ten pounds frequently, and could stand/or walk about six out of eight hours with normal breaks, and could sit about six. And assume that the person should avoid more than occasional use of the bilateral lower extremities to operate foot controls, and that the person could occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds, or work at unprotected dangerous heights, and around unprotected dangerous machinery….The person would be limited to occasional stoop, kneel, crouch, and, say, -- let's say avoid kneeling, crawling.
> Let's say the person would be limited to simple and/or repetitive work that didn't require close interaction with the public, and by that, I mean avoid jobs where the primary duty was to meet and greet the public such as customer service, or retail sales, things of that nature. And also no close interaction with coworkers such as a need to get together with coworkers to determine work duties, work processes, work locations, work tools, things of that nature.

(Tr. 59-60) The vocational expert stated that the hypothetical individual could not perform Plaintiff's past relevant work, but could perform the jobs of stock checker and routing clerk. (Tr. 61) When the ALJ limited the same hypothetical individual to sedentary work, "which would be a maximum lift of ten pounds, and a maximum stand and/or walk of about two out of eight hours

4

with normal breaks," the vocational expert testified that such individual could perform the jobs of assembler and stuffer of toys, pillows, or other small objects. (Tr. 61)

B. Medical Records Prior to March 31, 2015, the Date Last Insured

Plaintiff presented to the emergency room in July 2009 with right foot swelling and pain from an infected sore. (Tr. 292-99) Plaintiff returned to the emergency room in November 2010 with complaints of chest pain and weakness. (Tr. 315-24) On examination, Plaintiff was "positive for weakness" and "negative for myalgias, back pain and falls." (Tr. 317) Plaintiff's musculoskeletal examination revealed normal range of motion and an EKG "was within normal limits." (Tr. 319, 321) At the time, Plaintiff's medications included Xanax, diclofenac sodium, hydrochlorothiazide, and lisnopril. (Tr. 318) The doctor diagnosed Plaintiff with atypical chest pain and anxiety, instructed Plaintiff to stop taking Bystolic, prescribed lorazepam, continued lisinopril/HCTZ "as needed for anxiety," and instructed Plaintiff to follow-up with her primary care physician. (Tr. 316)

In September 2011, Plaintiff presented to the emergency room with low back pain and frequent urination. (Tr. 343-53) Plaintiff described the pain as mild, "intermittent bilateral flank tenderness" and rated its severity as a 1/10. (Tr. 346) Plaintiff's physical examination, including her range of motion and behavior, was normal. (Tr. 348) Plaintiff's symptoms resolved and she was discharged without medications. (Tr. 343, 350)

In January 2013, Plaintiff underwent a right knee x-ray, which showed "patellofemoral degenerative changes with suggestion of chondromalacia." (Tr. 421) The reviewing doctor suggested further evaluation by MRI. (Id.)

In January 2014, Plaintiff saw Dr. Moore, a primary care physician, for flank pain lasting about one month and a possible urinary tract infection (UTI). (Tr. 473-74) On examination,

5

Plaintiff's lumbar region was tender to palpation. (Tr. 474) Her mood and affect were normal. (Id.) Dr. Moore ruled out a UTI and prescribed Flexeril and lower back exercises. (Tr. 474) An ultrasound performed later that month revealed complex cystic ovarian lesion and a uterine fibroid. (Tr. 425)

Plaintiff presented to the emergency room on November 2, 2014 with complaints of left-sided low back pain after lifting a client at work on October 28. (Tr. 365-79) Plaintiff reported that the pain was "gradually worsening," "aching," and "mild." (Tr. 366) Plaintiff exhibited "pain and spasm," but her gait and range of motion were normal and she was "[n]egative for behavioral problems and agitation." (Tr. 367) Doctors prescribed Norco for pain as needed for up to three days. (Tr. 369)

Plaintiff returned to the emergency room with continued back pain ten days later. (Tr. 380-400) Plaintiff stated that the pain affected her thoracic spine and described it as "aching," "cramping," and "moderate." (Tr. 383) A physical examination revealed normal range of motion and tenderness in her thoracic back, but no bony tenderness. (Tr. 385) Plaintiff's strength, gait, mood, and affect were normal. (Tr. 386) An x-ray of Plaintiff's thoracic spine revealed thoracic spondylosis and no acute compression fracture. (Tr. 389) The doctor prescribed Norco, prednisone, and Flexeril. (Tr. 380)

On November 26, Plaintiff visited Dr. Keefe at Mercy Corporate Health Occupational Medicine Clinic. (Tr. 271-73) Plaintiff explained that she was "lifting a patient to put them back in bed, [and] she felt a strain on her upper back." (Tr. 272) Dr. Keefe completed a review of systems, which revealed anxiety and "[t]enderness from beltline up to mid-back level," "intact flexion with moderate pain," and intact right and left rotation "with moderate pain," "intact left lateral flexion with moderate pain," "intact right lateral flexion with mild pain," "stands upright

6

with mild pain," and "normal gait." (Tr. 272) An x-ray showed mild levoscoliosis and mild degenerative changes in lumbar spine, especially L3-L4. (Tr. 426) Dr. Keefe diagnosed Plaintiff with "strain, mid to low back," prescribed acetaminophen/hydrocodone and cyclobenzaprine, referred Plaintiff to physical therapy, and imposed the following restrictions: "[N]o lifting over 10 pounds. No frequently or prolonged bending over. No pushing or pulling over 30 pounds." (Tr. 273)

When Plaintiff returned to Dr. Keefe's office on December 14 she reported continued "discomfort in mid back and low back," which "seems worse after doing any activities." (Tr. 277) Plaintiff stated that the Vicodin and ibuprofen were "helping some," and she did not attend physical therapy because "[n]o one called about PT app[ointments]." (Id.) On examination, Plaintiff was anxious. (Id.) Plaintiff continued to experience tenderness in her lower to mid back, and Dr. Keefe observed intact flexion with moderate pain, intact left rotation with moderate pain, and intact right rotation with mild pain. (Id.)

The next day, Plaintiff visited orthopedic surgeon Dr. Coyle. (Tr. 432-33) Dr. Coyle noted that Plaintiff had a "mild antalgic gait in the left due to her old ankle injury" and that she was "able to forward flex about ninety degrees at the waist." (Tr. 433) On examination, Dr. Coyle observed the following: "palpable muscle spasm over the latissimus muscles bilaterally"; "trace reflexes at the patella and ankle"; no focal motor deficits or sensory deficits in the lower extremities; negative straight leg raise test bilaterally; and "no sciatic notch tenderness." (Id.) An MRI revealed multilevel degenerative disc disease, small protrusion on the left at L4-5, and chronic herniation on the left L5-S1. (Tr. 433) Dr. Coyle noted that Plaintiff "is normally very active," "farms and has horses," and "rides a Harley." (Tr. 433) He diagnosed her with

latissimus strain, prescribed a Medrol Dosepak and Soma, did not recommend surgery, referred Plaintiff to physical therapy, and restricted her to lifting no more than twenty-five pounds. (Id.)

Plaintiff presented to the emergency room for right knee pain in late-December 2014. (Tr. 401-21) Plaintiff reported that Dr. Harris evaluated her in early 2013 and scheduled arthroscopy for a medial meniscus tear and chondromalacia of patella, but Plaintiff cancelled because she wanted a second opinion. (Tr.404) Plaintiff also stated that the "[k]nee pain and swelling [were] worse over the past couple of days after straining to pull a trailer." (Id.) A physical examination revealed arthralgias (right knee) but no back pain, myalgias, neck pain, or stiffness. (Id.) Plaintiff also exhibited decreased range of motion, swelling, effusion, and bony tenderness in her right knee. (Tr. 406) Her mood, affect, cognition, and memory were normal. (Tr. 406) The treating doctor prescribed Norco and recommended: crutches, Ace bandage, Aleve, rest, ice compression, and elevation. (Tr. 406-07)

Plaintiff followed up with Dr. Coyle in March 2015. (Tr. 430-31) Dr. Coyle reviewed the notes from Plaintiff's physical therapist, which "as of January indicate that her back improved overall, and she no longer had spasms[.]" (Tr. 430) Dr. Coyle noted: "On examination, she localizes her pain to the lumbosacral junction; this is not where her pain was localized when I last saw her. She also reports intermittent radiating pain in her thighs." (Tr. 430) Dr. Coyle observed that Plaintiff was able to forward flex and touch the floor and she had no muscle atrophy, weakness, or lower extremity deficits except left ankle range of motion where she had undergone an ankle fusion. (Tr. 428, 431) Dr. Coyle opined that her symptoms were not consistent with lumbar radiculopathy, there was "no evidence or indication for surgery," her current complaints were "unrelated to those she had when [he] first evaluated her in

December," and "she is, in general, very poorly conditioned." (Id.) Dr. Coyle placed no restrictions on Plaintiff's physical activity. (Tr. 461)

### III. Standard for Determining Disability Under the Act

Eligibility for disability benefits under the Social Security Act requires a claimant to demonstrate that he or she suffers from a physical or mental disability. 42 U.S.C. § 423(a)(1). The Act defines disability as "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period not less than 12 months." 42 U.S.C. § 423(d)(1)(A); see also 20 C.F.R. § 404.1505(a). The impairment must be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy ...." 42 U.S.C. § 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process. See 20 C.F.R. § 404.1520. Those steps require a Plaintiff to show that he or she: (1) is not engaged in substantial gainful activity; (2) has a severe impairment or combination of impairments which significantly limits his or her physical or mental ability to do basic work activities or (3) has an impairment which meets or exceeds one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1; (4) is unable to return to his or her past relevant work; and (5) the impairments prevent him or her from doing any other work. Id.

### IV. ALJ Decision

The ALJ found that Plaintiff: (1) did not engage in substantial gainful activity during the period from her alleged onset date of February 1, 2010 through her date last insured of March 31, 2015; (2) had the severe impairments of "degenerative disc disease, history of a left ankle

9

fracture, depression and anxiety"; and (3) did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 17)

The ALJ reviewed Plaintiff's testimony and medical records and determined that "the evidence contained in the record prior to the claimant's date last insured [of] March 31, 2015, fails to support allegations of a severe and debilitating impairment or combination of impairments." (Tr. 21) The ALJ explained: "The treatment notes indicate at best, ailments that appeared troublesome, but did not impose limitations of such significance as to preclude sustained competitive employment." (Id.) The ALJ found that, through the date last insured, Plaintiff had the residual functional capacity (RFC) to perform light work with the following limitations:

> No more than occasional use of the lower extremities for operation of foot controls; no more than occasionally climbing ramps and stairs; never climbing ramps, ladders and scaffolds[2]; she should avoid working at unprotected heights and with or around hazardous machinery; exposure to full body vibration; ambulating on unimproved terrain; and no more than occasionally stooping, crouching; and she should avoid kneeling and crawling. The claimant would be further limited to simple, routine, repetitive tasks with no close contact with the public and coworkers.

(Tr. 19)

Based on the vocational expert's testimony, the ALJ found that Plaintiff was unable to perform any past relevant work but "there were jobs that existed in significant numbers in the national economy that the claimant could have performed[.]" (Tr. 21-23) More specifically, the ALJ determined that Plaintiff was able to perform the jobs of stocker/checker-apparel and routing clerk. (Tr. 24) The ALJ therefore concluded that Plaintiff "was not under a

---

[2] Plaintiff points out that the ALJ "made two inconsistent but reconcilable findings that she should no more than occasionally climb ramps, and she should never climb ramps. Precluding ramps reconciles the error in the finding." [ECF No. 13 at 4]

disability…at any time from February 1, 2010, the alleged onset date, through March 31, 2015, the date last insured." (Id.)

V.     **Discussion**

Plaintiff claims that substantial evidence did not support the ALJ's decision because the ALJ failed "to fully and fairly develop the record regarding this claim with a date last insured of March 31, 2015." [ECF No. 13 at 5] More specifically, Plaintiff contends the ALJ improperly relied on evidence of Plaintiff's condition at the time of the November 2017 hearing when he found that Plaintiff was not disabled during the period of February 2010 through March 2015. Plaintiff further argues that the vocational expert's testimony lacked "evidentiary value because it is based on evidence of her condition as of the November 2017 hearing, two and one-half years after….the end of the period at issue." [Id. at 1] The Commissioner counters that the ALJ properly developed the record, discussed at the hearing Plaintiff's condition during the relevant period, and relied on the vocational expert's testimony. [ECF No. 20]

A. Standard of Judicial Review

A court must affirm an ALJ's decision if it is supported by substantial evidence. 42 U.S.C. § 405(g). "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Chesser v. Berryhill, 858 F.3d 1161, 1164 (8th Cir. 2017) (quoting Prosch v. Apfel, 201 F.3d 1010, 1012 (8th Cir. 2000)). The Court must consider "both evidence that supports and evidence that detracts from the ALJ's decision, [but it] may not reverse the decision merely because there is substantial evidence support[ing] a contrary outcome." Id. (internal quotation marks omitted) (quoting Prosch, 201 F.3d at 1012).

A court does not "reweigh the evidence presented to the ALJ, and [it] defer[s] to the ALJ's determinations regarding the credibility of testimony, as long as those determination are supported by good reasons and substantial evidence." Renstrom v. Astrue, 680 F.3d 1057, 1064 (8th Cir. 2012) (quoting Gonzales v. Barnhart, 465 F.3d 890, 894 (8th Cir. 2006)). Therefore, a court must affirm the ALJ's decision if "it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings[.]" Wright v. Colvin, 789 F.3d 847, 852 (8th Cir. 2015) (quoting Perkins v. Astrue, 648 F.3d 892, 897 (8th Cir. 2011)).

B. Duty to develop the record

Plaintiff asserts that the ALJ did not satisfy his duty to develop the record with regard to Plaintiff's impairments during the relevant period of February 2010 through March 2015. In particular, Plaintiff contends that the ALJ improperly relied on Plaintiff's testimony about her symptoms at the time of the November 2017 hearing when assessing the severity of her symptoms prior to March 31, 2015.

If a claimant makes statements about the intensity, persistence, and limiting effects of her symptoms, the ALJ must determine whether the statements are consistent with the medical and other evidence of record. SSR 16-3p, 2017 WL 5180304, at *8 (SSA. Oct. 2017). See also 20 C.F.R. § 404.1529(c)(3) (explaining how the SSA evaluates symptoms, including pain). When evaluating a claimant's subjective statements about symptoms, the ALJ must "give full consideration to all of the evidence presented relating to subjective complaints," including a claimant's work history and observations by third parties and physicians regarding: "(1) the claimant's daily activities; (2) the duration, frequency and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; and (5) functional restrictions." Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). "If an ALJ

explicitly discredits the claimant's testimony and gives good reason for doing so, [a court] will normally defer to the ALJ's credibility determination." Gregg v. Barnhart, 354 F.3d 710, 714 (8th Cir. 2003). See also SSR 16-3p, 2017 WL 5180304, at *11.

An ALJ has a duty to fully and fairly develop the record, and failure to do so is reversible error when the record "does not contain enough evidence to determine the impact of a claimant's impairment on his ability to work." Byes v. Astrue, 687 F.3d 913, 915-16 (8th Cir. 2012). "However, the burden of persuasion to prove disability and to demonstrate RFC remains on the claimant." Eichelberger v. Barnhart, 390 F.3d 584, 592 (8th Cir. 2004). "An ALJ's duty to develop the record arises only if a crucial issue was undeveloped." Leininger v. Colvin, No. 4:12-CV-623 JCH/TIA, 2013 WL 5276039, at *14 (E.D. Mo. Sept. 18, 2013).

Plaintiff appears to argue that the ALJ failed to fully and fairly develop the record because he did not ask Plaintiff more date-specific questions during the hearing. However, the record as a whole contained sufficient evidence for the ALJ to assess the credibility of Plaintiff's subjective complaints and determine that she was not disabled prior to her date last insured.

At the hearing, Plaintiff testified that she was diagnosed with osteomyelitis in her left ankle and began using a crutch when she was five years old. In regard to her right knee pain, Plaintiff stated that in 2013 an orthopedic surgeon diagnosed a torn meniscus and recommended surgery. Plaintiff also testified that she suffered pain in her back and hips, and she had been taking Norco since 2014. When asked about her mental health, Plaintiff stated she had suffered anxiety depression "a long time" and began taking fluoxetine in 2010.

In addition to Plaintiff's testimony, the record contained over sixty pages of medical notes discussing Plaintiff's condition prior to the date last insured. The records reveal that Plaintiff sought treatment for chest pain/anxiety in November 2010 and low back and flank pain

in September 2011 and January 2014. A right knee x-ray in January 2013 showed patellofemoral degenerative changes with suggestion of chondromalacia.

In late-October 2014, Plaintiff injured her back lifting a patient at work and, in November, Dr. Keefe began treating Plaintiff's mid-to-low back strain with medication. In December, an MRI revealed multilevel degenerative disc disease, small protrusion on the left at L4-5, and chronic herniation on the left L5-S. Orthopedic surgeon Dr. Coyle diagnosed Plaintiff with latissimus strain, prescribed a Medrol Dosepak and Soma, recommended physical therapy, and restricted Plaintiff to lifting no more than twenty pounds.

Later that month, Plaintiff presented to the emergency room with right knee pain after "straining to pull a trailer." Plaintiff had decreased range of motion in the right knee, as well as swelling, effusion, and bony tenderness, but she denied back pain. The doctor prescribed Norco and an Ace bandage. When Plaintiff followed-up with Dr. Coyle in March 2015, she identified pain in the lumbosacral junction, not the latissimus muscles.

The ALJ reviewed the testimony and medical records and determined that the "evidence contained in the record prior to the claimant's date last insured March 31, 2015, fails to support allegations of a severe and debilitating impairment or combination of impairments." (Tr. 21) The ALJ discounted Plaintiff's subjective complaints during the period in question because they were not supported by medical evidence. (Tr. 19) In particular, the ALJ noted that the following "were inconsistent with the severity and pain levels" alleged by Plaintiff: images showing mild levoscoliosis and mild degenerative changes, Dr. Coyle's findings upon examination in December 2015, and Plaintiff's "essentially normal physical examination" in March 2015. The lack of supporting objective medical evidence is a proper factor for an ALJ to

consider when discounting a claimant's subjective complaints.  See Ford v. Astrue, 518 F.3d 979, 982 (8th Cir. 2008).

The ALJ also discredited Plaintiff's subjective complaints of pain because, during the period in question, Plaintiff did not require surgery or hospitalization and she received conservative treatment.  The need for only conservative treatment undermines allegations of disabling pain.  See Milam v. Colvin, 794 F.3d 978, 985 (8th Cir. 2015); Gowell v. Apfel, 242 F.3d 793, 796 (8th Cir. 2001).  Moreover, with regard to back pain, Plaintiff's medical records suggest that, by late-December, her medications effectively controlled her back pain.  Plaintiff reported back pain to Dr. Coyle on December 15 but, when she presented to the emergency room for her knee on December 31, she denied back pain.  Although Plaintiff complained of back pain to Dr. Coyle in March 2015, Dr. Coyle determined that those complaints were unrelated to those he previously treated.  "If an impairment can be controlled by treatment or medication, it cannot be considered disabling."  Brown v. Astrue, 611 F.3d 941, 955 (8th Cir. 2010) (quoting Brace v. Astrue, 578 F.3d 882, 885 (8th Cir. 2009)).

Additionally, although not addressed in the context of Plaintiff's subjective complaints, the ALJ discussed Plaintiff's activities of daily living, which suggested that her symptoms were less severe than alleged.  For example, the ALJ noted that, in December 2014, Plaintiff informed Dr. Coyle that she farmed, owned horses, and rode a motorcycle. (Tr. 21)  When she presented to the emergency room with knee pain later that month, she reported that she injured her knee "straining to pull a trailer."  An ALJ may discount a claimant's subjective complaints if they are inconsistent with her activities of daily living.  See McDade v. Astrue, 720 F.3d 994, 998 (8th Cir. 2013).

In regard to Plaintiff's anxiety and depression, the ALJ observed that Plaintiff "has had no inpatient psychiatric hospitalization or outpatient treatment" and "has never sought or been referred to a psychiatrist, psychologist or other mental health professional." (Tr. 22) Instead, Plaintiff received treatment, in the form of medication, from her primary care physician "as part of her routine visits." (Id.) Nevertheless, the ALJ gave Plaintiff "the benefit of the doubt with respect to her functional limitations" and limited her to simple, routine, repetitive tasks with no close contact with the public and coworkers. (Tr. 19, 22)

The records support the ALJ's finding that Plaintiff received routine and conservative mental health treatment from her primary care provider. Plaintiff did not seek treatment from a mental health specialist. Failure to seek mental health treatment is a relevant consideration when evaluating a claimant's mental impairment. See Partee v. Astrue, 638 F.3d 860, 864 (8th Cir. 2011). Furthermore, the absence of complaints relating to her mental health or ability to sleep from December 2011 through March 2015 suggests that her medications effectively controlled those symptoms during the relevant time period.[3] As previously discussed, a condition that is "controllable and amenable to treatment [] 'do[es] not support a finding of disability.'" Martise v. Astrue, 641 F.3d 846, 924 (8th Cir. 2011) (quoting Davidson v. Astrue, 578 F.3d 838, 846 (8th Cir. 2009)).

Based on the Court's review, the evidence in the record provided sufficient basis for the ALJ to assess Plaintiff's subjective complaints and physical and mental impairments from February 2010 through March 2015. The ALJ, therefore, did not err in failing to obtain

---

[3] As to Dr. Keefe's observations that Plaintiff was anxious upon examination in November and December 2014, those symptoms corresponded with Plaintiff's back injury. See Tindell v. Barnhart, 444 F.3d 1002, 1007 (8th Cir. 2005) (situational depression did not support a finding of disability); Dunahoo v. Apfel, 241 F.3d 1033, 1039-40 (8th Cir. 2001) (depression resulting from financial difficulties was situational and not disabling).

additional testimony from Plaintiff. The Court further notes that Plaintiff was represented by counsel at the hearing and the ALJ provided counsel the opportunity to ask questions and develop the record. See Fett v. Colvin, No. C 14-3034-MWB, 2015 WL 5999835, at *18 (N.D. Iowa Oct. 15, 2015) ("Although the ALJ has a duty to develop the record, the ALJ does not have a specific duty to correct counsel's poorly worded questions."). No crucial issue was left undeveloped and the record contained substantial evidence to support the ALJ's finding that Plaintiff was not disabled.[4]

## VI. Conclusion

For the reasons discussed above, the undersigned finds that substantial evidence in the record as a whole supports the Commissioner's decision that Plaintiff is not disabled. Accordingly,

**IT IS HEREBY ORDERED** that the final decision of the Commissioner denying Social Security benefits is **AFFIRMED**.

A separate judgment in accordance with this Memorandum and Order is entered this date.

_____
PATRICIA L. COHEN
UNITED STATES MAGISTRATE JUDGE

Dated this 1st day of October 1st, 2019

---

[4] "A vocational expert's testimony constitutes substantial evidence when it is based on a hypothetical that accounts for all of the claimant's proven impairments." Buckner v. Astrue, 646 F.3d 549, 560-61 (8th Cir. 2011) (quoting Hulsey v. Astrue, 622 F.3d 917, 922 (8th Cir. 2010)). In this case, the ALJ included in the hypothetical question he posed to the vocational expert the limitations he found impaired Plaintiff's ability to work between February 2010 and March 2015. Accordingly, the vocational expert's testimony constituted substantial evidence supporting the ALJ's decision that Plaintiff was not disabled.